IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DOUGLAS P. LEITE and MARY ANN K. LEITE, | ) ) | CIVIL NO. 11-00636 JMS/RLP |
| | ) | ORDER (1) SUSTAINING |
| Plaintiffs, | ) | OBJECTIONS TO JANUARY 23, |
| | ) | 2012 FINDINGS AND |
| vs. | ) | RECOMMENDATION TO GRANT |
| | ) | PLAINTIFFS' MOTION FOR |
| CRANE COMPANY, a Delaware | ) | REMAND; AND (2) DENYING |
| Corporation, et al., | ) | MOTION FOR REMAND |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER (1) SUSTAINING OBJECTIONS TO JANUARY 23, 2012 FINDINGS AND RECOMMENDATION TO GRANT PLAINTIFFS' MOTION FOR REMAND; AND (2) DENYING MOTION FOR REMAND

## I. INTRODUCTION

On September 6, 2011, Plaintiffs Douglas and Mary Leite

("Plaintiffs") filed this action in the First Circuit Court of the State of Hawaii

asserting claims against eighteen Defendants that manufactured, sold and/or

supplied various products containing asbestos to the United States Navy. As

alleged in the Complaint, Douglas Leite was exposed to asbestos contained in

Defendants' products while working as a machinist at the Pearl Harbor Naval

Shipyard ("PHNS") from 1966 to 1972, causing him to develop asbestos-related

diseases.

On October 21, 2011, Defendant Crane Company ("Crane") removed the action to this court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which allows removal where a defendant can establish a colorable federal defense. In response, Plaintiffs filed their Motion to Remand. On January 23, 2012, Magistrate Judge Richard L. Puglisi entered his Findings and Recommendation to grant Plaintiffs' Motion for Remand (the "January 23 F&R"), finding that Defendants had not established a colorable federal defense.

Currently before the court are several Defendants' Objections to the January 23 F&R. As explained below, the court finds that removal pursuant to § 1442(a)(1) was proper and therefore SUSTAINS the Objections to the January 23 F&R and DENIES the Motion for Remand.

## II. BACKGROUND

### A. Plaintiffs' Allegations Against Defendants

The Complaint, filed September 6, 2011 in the First Circuit Court of the State of Hawaii, alleges that Douglas Leite was exposed to asbestos while working as a machinist at the PHNS from 1966 through 1972, causing him to develop pleural plaques and other asbestos-related diseases and injuries, which he first discovered in May 2010. Doc. No. 3-1, Compl. ¶ 6. Plaintiffs bring this action against various companies that manufactured, sold, and/or supplied asbestos

products to the PHNS including Crane; Aurora Pump Co. ("Aurora"); Bayer

Cropscience, Inc., successor-in-interest to Rhone Poulenc AG Co., fka Amchem

Products, Inc. fka Benjamin Foster Products Co. ("Bayer"); Union Carbide Corp.;

Air & Liquid Systems Corp., successor-by-merger to Buffalo Pumps, Inc.

("Buffalo Pumps"); Certainteed Corp.; Cleaver-Brooks, Inc. ("Cleaver Brooks");

Goulds Pumps, Inc. ("Goulds"); IMO Industries, Inc. individually and as

successor-in interest to Delaval Inc., and Delaval Steam Turbine Co. ("IMO");

Ingersoll Rand Co. ("Ingersoll"); John Crane, Inc.; the Lynch Co.; Metropolitan

Life Insurance Co. ("Met Life"); Warren Pumps, Inc. ("Warren"); the William

Powell Co. ("Powell"); Velan Valve Corp. ("Velan"); Copes-Vulcan ("Copes");

and Atwood & Morrill ("Atwood").

The Complaint asserts that Aurora, Buffalo, Cleaver-Brooks, Crane

Co., Goulds, IMO, Ingersoll, Met Life, Powell, Warren, Velan, Copes, and Atwood

(collectively, "Supplier Defendants"):

> sold and supplied certain equipment to the United States
> Navy and Pearl Harbor Naval Shipyard and other
> shipyards, which contained asbestos gaskets and/or
> packing, required asbestos insulation, or required other
> asbestos containing parts to function properly; and also
> sold replacement component parts for their equipment,
> including asbestos gaskets and packing which were
> identical to their commercial counterparts.

*Id.* ¶ 5. The Complaint alleges that all other Defendants ("Manufacturer

3

Defendants") "manufactured, sold and/or supplied certain generically similar asbestos products which were ultimately used by insulators and others, and/or to which they came in contact, while working in their trades and occupations in the State of Hawaii and other locations," and "manufactured, sold and/or supplied certain generically similar asbestos products to Pearl Harbor Naval Shipyard and other shipyards and ships for use in the general overhaul, building, refitting and maintenance of ships." *Id.* Based on these allegations, Plaintiffs assert various claims against Defendants and in particular, claims against Supplier Defendants for negligent and strict liability failure to warn of the dangers of asbestos. *See id.* ¶¶ 5, 9, 16.

## B.    Defendants' Removal and Plaintiffs' Motion to Remand

On October 21, 2011, Crane removed the action to this court on the basis of federal officer jurisdiction pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446. IMO, Warren Pumps, and Buffalo Pumps subsequently filed joinders. Doc. Nos. 1, 2, 12. In response, Plaintiffs filed their Motion to Remand on November 10, 2011. Doc. No. 29. Oppositions were filed November 28, 2011, and Replies were filed on December 12, 2011. The January 23, 2012 F&R followed.

On February 6, 2012, Crane, IMO, Warren Pumps and Buffalo Pumps

filed Objections to the January 23 F&R.[1]

## III. <u>STANDARD OF REVIEW</u>

When a party objects to a magistrate judge's findings or recommendations, the district court must review de novo those portions to which the objections are made and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) ("[T]he district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise.").

Under a de novo standard, this court reviews "the matter anew, the same as if it had not been heard before, and as if no decision previously had been rendered." *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1004 (9th Cir. 2006); *United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988). The district court need not hold a de novo hearing; however, it is the court's obligation to arrive at its own independent conclusion about those portions of the magistrate judge's findings or recommendation to which a party objects. *United States v. Remsing*, 874 F.2d 614,

---

[1] Although Plaintiffs did not file any Responses to the Objections, the briefing in this action mirrors the briefing in other asbestos cases before this court and in which Magistrate Judge Puglisi entered Findings and Recommendation to remand. The court takes into account the Responses to Objections filed by Plaintiffs in those other cases.

616 (9th Cir. 1989).

# IV. <u>ANALYSIS</u>

The federal officer removal statute, 28 U.S.C. § 1442(a)(1), states that a civil action commenced in state court is removable when "any officer (or any person acting under that officer) of the United States or of any agency thereof, [is sued for] any act under color of such office." "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006) (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)); *see also Mesa v. California*, 489 U.S. 121, 124-25 (1989).

"Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Acker*, 527 U.S. at 431. The reasoning behind § 1442(a)(1) is that "[i]f the federal government can't guarantee its agents access to a federal forum if they are sued or prosecuted, it may have difficulty finding anyone willing to act on its behalf." *Durham*, 445 F.3d at 1253; *see also Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969)

(explaining that allowing removal ensures that "where federal officers can raise a colorable defense arising out of their duty to enforce federal law," they "have such defenses litigated in the federal courts").

As a result, although removal statutes are generally construed strictly against removal, the Supreme Court has mandated that § 1442(a)(1) be "liberally construed to give full effect to the purposes for which [it was] enacted," *Durham*, 445 F.3d at 1252, and "the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (quoting *Willingham*, 395 U.S. at 407)). Thus, to justify removal, a defendant need not assert a "clearly sustainable defense," nor does he need to "win his case before he can have it removed." *Willingham*, 395 U.S. at 407; *see also Acker*, 527 U.S. at 431. Rather, where a defendant seeks removal pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the defendant's removal] claim is not without foundation and is made in good faith." *Colorado v. Symes*, 286 U.S. 510, 519 (1932).

The parties dispute whether Defendants have established two elements necessary for federal officer removal -- a colorable federal defense, and a causal nexus between Defendants' actions taken pursuant to the Navy's directions and

Plaintiffs' failure-to-warn claims.[2]  The arguments and evidence presented by the parties are not novel -- defendants in numerous state asbestos cases have removed them to federal court on the basis of § 1442(a)(1), and district courts (including the asbestos multi-district litigation ("MDL") court) have addressed the issues and evidence presented in the parties' voluminous briefings.  And these courts are split -- in the specific context of failure-to-warn claims, district courts have fallen on both sides of removal and the MDL court has denied remand.  *See, e.g.*, *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770 (E.D. Pa. 2010) (holding in MDL proceeding that defendants established a colorable federal defense supporting removal);[3] *Ellis v. Pneumo Abex Corp.*, 798 F. Supp. 2d 985 (C.D. Ill. 2011) (denying remand motion); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51 (D. Mass. 2008) (same); *Beckwith v. Gen. Elec. Co.*, 2010 WL 1287095 (D. Conn. Mar. 30, 2010) (same); *Cardaro v. Aerojet Gen. Corp.*, 2010 WL 3488207 (E.D. La. Aug. 27, 2010) (remanding action); *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009) (same).

---

[2]  Plaintiffs do not dispute that Defendants are "persons" for purposes of 28 U.S.C. § 1442(a)(1).

[3]  The Judicial Panel on Multidistrict Litigation, in ceasing the transfer of tag-along actions to the asbestos MDL, stated that "the judges presiding over [the actions that will now be no longer transferred to the MDL] will almost certainly find useful guidance in the many substantive and thoughtful rulings that have been issued during the lengthy course of the Multi district proceedings." *In re Asbestos Prods. Liability Litig.*, --- F. Supp. 2d ----, 2011 WL 6355308, at *2 (U.S. Jud. Pan. Mult. Litig. Dec. 13, 2011).

Needless to say, this split in caselaw shows that the issues presented are not clear-cut and well-reasoned courts may come to opposite conclusions. The January 23 F&R agreed with Plaintiffs that Defendants have not established a colorable federal defense and recommends that this action be remanded. But based on a de novo review and addressing the two elements in dispute for federal officer removal, this court finds that Defendants properly removed this action pursuant to § 1442(a)(1).

## A.    Colorable Federal Defense

To establish a colorable federal defense, Defendants invoke the government contractor defense. The court first outlines legal framework for this defense, and then outlines the evidence and applies that evidence to the defense's elements.

### 1.    *Framework*

The government contractor defense "protects contractors from tort liability that arises as a result of the contractor's 'compli[ance] with the specifications of a federal government contract.'" *Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011) (quoting *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1000 (9th Cir. 2008)). This defense "displaces state law only when the Government, making a discretionary, safety-related military procurement decision

contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." *In re Haw. Fed. Asbestos Cases*, 960 F.2d 806, 813 (9th Cir. 1992) (quoting *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2nd Cir. 1990)).

In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988), the Supreme Court held that a contractor establishes this defense where: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle* explains that "[t]he first two of these conditions assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated -- *i.e.*, they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself," while the third condition precludes any manufacturer incentive to withhold knowledge of risks. *Id.*

Because *Boyle* addresses design and manufacture defect claims, courts have recast these elements to apply to failure-to-warn claims -- "a contractor cannot defeat a failure-to-warn claim simply by establishing the elements of the

*Boyle* defense as it applies to design and manufacturing defect claims." *Getz*, 654 F.3d at 866; *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003-04 (7th Cir. 1996) (same); *see also Tate v. Boeing Helicopters*, 140 F.3d 654, 656 (6th Cir. 1998) ("Warning the government of dangers arising from its specific design . . . does not encompass or state a failure to warn claim; it simply encourages contractors to provide the government with all the information required to soundly exercise its discretion." (quotations omitted)).

In *Getz*, the Ninth Circuit joined other circuits in holding that in the failure-to-warn context, a contractor establishes this defense where "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." 654 F.3d at 866 (quoting *Oliver*, 96 F.3d at 1003-04); *see also Tate*, 140 F.3d at 656-57 (stating same elements). In other words, "the contractor must demonstrate that the government 'approved reasonably precise specifications' thereby limiting the contractor's 'ability to comply with [its] duty to warn.'" *Getz*, 654 F.3d at 866 (quoting *Snell v. Bell Helicopter Textron, Inc*., 107 F.3d 744, 749 (9th Cir. 1997)).

*Getz* explains that the focus of the analysis is on "government

discretion, rather than dictation,"[4] and specifically rejected that the Ninth Circuit's earlier decisions of *Butler* and *Hawaii Federal Asbestos* in any way limit the defense "to cases in which the government specifically forbids warnings altogether or to instances where the government explicitly dictates the content of the warnings adopted." *Id.* Rather, all that is required is "that governmental approval (or disapproval) of particular warnings 'conflict' with the contractor's 'duty to warn under state law.'" *Id.* (citing *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir. 1996); *Haw. Fed. Asbestos Cases*, 960 F.2d at 813). This clarification is consistent with the Sixth and Seventh Circuits, which both reject that failure-to-warn cases require "that the government 'prohibit' warnings altogether or 'dictate' the contents of the warnings actually incorporated." *Oliver*, 96 F.3d at 1004 n.8; *Tate*, 140 F.3d at 658 (rejecting that the review process by the government must address the warning in question). As *Tate* explains:

> The first condition of the [failure-to-warn government contractor defense] analysis requires only that the government exercise its discretion in approving the proposed warnings. In the failure to warn context, discretion occurs where the government is both knowledgeable and concerned about the contents of the proposed warnings before granting its approval. The

---

[4]  The focus on discretion is a product of the defense's roots -- "[t]he defense is intended to implement and protect the discretionary function exception of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a)." *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1000 (9th Cir. 2008).

> government is sufficiently knowledgeable when it has a
> complete enough understanding of the proposed
> warnings to reasonably recognize which hazards have
> been thoroughly addressed and which have not. The
> government is sufficiently concerned when it
> demonstrates a willingness to remedy or require the
> remedy of any inadequacies it finds in the proposed
> warnings. Where government knowledge and concern
> are exhibited through the review process, it may be fairly
> said that the government has decided which warnings
> should and should not be provided to end users.

140 F.3d at 658; *see also Hagen*, 739 F. Supp. 2d at 783 (explaining that the

failure-to-warn factors are "largely derived" from *Boyle*, with the operative

difference being that government approval must "'transcend rubber stamping' for

the defense to shield a government contractor from failure to warn liability").

Because the government contractor defense "is an affirmative defense,

[Defendants have] the burden of establishing it." *Snell*, 107 F.3d at 746. The court

is nonetheless mindful, however, that at the removal stage the federal defense need

only be "colorable." *Mesa*, 489 U.S. at 121; *see also Acker*, 527 U.S. at 431

(stating that the defendant is not required to "win his case before he can have it

removed" (quoting *Willingham*, 395 U.S. at 407)). The MDL asbestos action

explains:

> While the Court must require that the facts identified by
> the defendant support the federal defense, the Court is
> not called upon at this preliminary stage to pierce the
> pleadings or dissect the facts stated. Nor is it the Court's

function at this stage to determine credibility, weigh the quantum of evidence or discredit the source of the defense. *Cf.* Black's Law Dictionary 282 (9th ed. 2009) (defining a colorable claim as "a claim that is legitimate and that may reasonably be asserted, given the facts presented and the current law (or a reasonable and logical extension or modification of the current law)"). It is the sufficiency of the facts stated -- not the weight of the proof presented -- that matters. . . . Thus, the Court concludes that a defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial.

*Hagen*, 739 F. Supp. 2d at 782-83.[5]

## 2. The Parties' Evidence

Both parties present voluminous exhibits regarding the government contractor defense, with Defendants arguing that the Navy's close oversight prevented them from providing warnings, and Plaintiffs arguing that nothing prevented Defendants from including asbestos warnings with their products. The court first outlines the evidence presented (including Plaintiffs' objections) and then analyzes each element of this defense.

---

[5] Plaintiffs argue that *Hagen* is contrary to Ninth Circuit law to the extent is suggests that a defendant need only allege, as opposed to present evidence of, a colorable federal defense. The court rejects this argument -- *Hagen* both states that a defendant must "identify facts, which, viewed in the light most favorable to the defendant, would establish a complete defense at trial," and engages the evidence presented.

Supplier Defendants each manufactured and supplied for the Navy

equipment pursuant to an extensive set of standards and specifications referred to

as Navy Specifications, or "Milspecs."  Doc. No. 3-3, Anthony D. Pantaleoni Aff.

¶¶ 5-6; Doc. No. 12-8, Martin K. Kraft Aff. ¶¶ 5-6; Doc. No. 76-10, Richard M.

Salzmann Decl. ¶ 6; Doc. No. 80-66, Rolan Doktor Aff. ¶¶ 7-9.  According to Rear

Admiral Roger B. Horne Jr., who served with the Navy from 1956 through 1991

concentrating on ship design, engineering, construction, overhaul and inspection,

and monitoring compliance with Milspecs, these Milspecs "were drafted, approved

and maintained by the Navy . . . to address all aspects of shipboard equipment and

materials requirements, including the materials to be used [and] labeling that went

on equipment."  Doc. No. 12-2, Roger B. Horne Aff. ¶¶ 2-3, 12.  As further

explained by Rear Admiral David P. Sargent, who served with the Navy from 1967

through 1999 and who was primarily involved with operation and maintenance of

Navy warships from 1967 through 1988, "[t]hese MILSPECS presented very

detailed descriptions of what the government required when procuring the items

covered by the MILSPECs, including requirements such as chemical composition,

dimensions, required testing and performance demonstrations, required labeling,

packaging and shipping requirements, and similar content."  Doc. No. 75, David P.

Sargent Aff. ¶ 26; *see also* Doc. No. 75-1, 75-2, Sargent Aff. Exs. A1, A2 (examples of Milspecs for pumps).

The Navy communicated Milspecs to vendors by issuing Requests for Proposal for the manufacture and supply of certain equipment, and then subsequently monitored the vendors' compliance through Naval Machinery Inspectors. Doc. No. 75, Sargent Aff. ¶ 29; Doc. No. 12-2, Horne Aff. ¶ 12. According to Admiral Sargent, "[e]quipment could not have been installed aboard Navy vessels unless it was first determined by the Navy to be in conformity with all applicable Navy specifications." Doc. No. 75, Sargent Aff. ¶ 29.

In specifying the materials to be used, some of these Milspecs required that equipment be made of asbestos. *See, e.g.*, Doc. No. 12-9, Kraft Aff. Ex. A, § 3.4.1.5 ("Pump casing joints shall be made up using compressed asbestos sheet gaskets."); *id.* Ex. B, § 3.26 (same); *see also* Doc. No. 75, Sargent Aff. ¶¶ 37-45 (describing the reasoning for using asbestos in insulation for Navy ships from the 1930s to the 1970s). The Milspecs also "covered the nature of any communication affixed to equipment supplied to the Navy," including, "among other things, materials to be used, methods of attachment, data to be included on such labels, and the size of the labeling plate." Doc. No. 12-2, Horne Aff. ¶ 12; *see also* Doc. Nos. 76, 76-1, Sargent Exs. L, M (specifications for identification plates

on equipment).

In addition to the Milspecs governing the design, manufacturing, and labeling of the equipment, "the Navy also had detailed specifications that governed the form and content of written materials to be delivered with equipment supplied to the Navy, [which] typically consisted of technical or instruction manuals that were designed to assist the Navy engineering staff in servicing and maintaining the equipment." Doc. No. 12-2, Horne Aff. ¶ 14. These technical manuals were "developed and provided as reference materials that can be consulted if and when required in the operation, maintenance and repair of equipment and systems," Doc. No. 75, Sargent Aff. ¶ 49, and "[t]he purpose of these documents was to provide information specific to the equipment, with a focus on its operation, and avoidance of injuries or accidents that might occur during operation." *Id.* ¶ 53. As a result, these "manuals were not . . . appropriate locations for warnings and cautions relating to general or widespread shipboard health issues." *Id.* ¶ 55.

According to Admiral Horne, "Navy personnel participated in and approved the preparation of this kind of information [and provided] detailed directions as to the kinds of information to be included." Doc. No. 12-2, Horne Aff. ¶ 14. Admiral Sargent further explains that "[t]he Navy approached this process for review and approval of technical manuals in an exacting manner. It

often created lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, including the wording of instructional material and warnings." Doc. No. 75, Sargent Aff. ¶ 59 (citing Sargent Ex. K). For example, the Navy reviewed "all aspects of the technical manuals and other written materials submitted to it for approval in the pump design and manufacture process" for Buffalo. Doc. No. 12-8, Kraft Aff. ¶ 14. In this review, the Navy "required specific changes to the content and wording of manuals submitted by Buffalo Pumps and other naval equipment manufacturers," including "specific edits to cautionary and instructional language, and including warnings and cautions." *Id.*; *see* Doc. No. 12-9, Kraft Ex. C (Navy providing line-edits to manual, including that "Under 'Warning' add the following 'Never use water on electrical fires. Use CO2. Also add 'When servicing pump, disconnect from source of electrical power and tag.'").

The result of the Navy's intimate oversight of written materials, Admiral Sargent contends, is that the "manuals included safety information to the extent -- and only to the extent -- directed by the Navy." Doc. No. 75, Sargent Aff. ¶ 59. In other words, "[m]anufacturers of components and equipment were not permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning

18

or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy." *Id.*; *see also id.* ¶ 57.

The reason for this level of oversight was because "[u]niformity and standardization of any communication, particularly safety information, are critical" to the Navy's operation and the "Navy could simply not operate safely and effectively if personnel were trained differently, or were provided with inconsistent information received from different manufacturers, each left to its own discretion in trying to anticipate the Navy's needs." *Id.* ¶ 61. This level of control ensured that the information provided in the manuals was "consistent with the Navy's overall evaluation of the appropriate types and level of information its personnel required to efficiently perform their job responsibilities under a variety of circumstances." *Id.* ¶ 60.

According to Admiral Sargent, the Navy focused the content of the manuals on "operating procedures and related equipment and personnel safety issues specifically associated with the particular equipment to which the technical manual related, rather than to generic occupational health issues." *Id.* ¶ 68. For example, one specification titled MIL-M-15071D(SHIPS) (6 June 1961) provides:

> Notes, cautions and warnings. -- Notes, cautions and warnings should be used to emphasize important and

critical instructions.  The use should be as sparing as is consistent with real need.

(a) "NOTE" -- An operating procedure, condition, etc., which is essential to highlight.

(b) "CAUTION" -- Operating procedures, practices, etc., when if not strictly observed, will result in damage or destruction of equipment.

(c) "WARNING" -- Operating procedures, practices, etc., which will result in personal injury or loss of light if not correctly followed.

Doc. No. 76-7, Sargent Ex. S § 3.3.6.  Admiral Sargent explains that "these terms could only be included in a technical manual to emphasize specific operating instructions that, if not properly followed, would result in either damage to the equipment or related injury to the operator."  Doc. No. 75, Sargent Aff. ¶ 68.

As to warnings regarding asbestos in particular, Admiral Horne asserts that the "specifications did not require manufacturers of Naval equipment to include warnings pertaining to potential asbestos hazards [and] [t]he Navy's detailed specifications did not leave room for individual manufacturers to make determinations about the inclusion of a warning."  Doc. No. 12-2, Horne Aff. ¶ 15.  As a result, "[a]ny warning purportedly required by state law would not have found its way into a ship as a permanent label on a pump or as a warning in accompanying written materials unless it had been required specifically in specifications for the product that were issued by the Navy."  *Id.* ¶ 16.

Admiral Sargent agrees:

> Consistent with its objective to ensure that all documentation to which its personnel were exposed by thoroughly consistent with its overall training and procedures, the Navy would not have permitted equipment suppliers to place asbestos-related warnings on packaging or containers for pumps or related parts or items supplied during the 1940s, 1950s, or 1960s. Similarly, the Navy would not have permitted equipment suppliers to place asbestos-related warnings in any literature or documentations supplied with pumps for Navy ships during the 1940s, 1950s and 1960s.

Doc. No. 75, Sargent Aff. ¶ 62. In sum, "the Navy did not accept, and did not permit, asbestos-related warnings in technical manuals relating to individual pieces of machinery or equipment, and . . . such warnings were . . . neither sought nor welcome from manufacturers of such items." *Id.* ¶ 65; *see also* Doc. No. 7, Samuel P. Forman Aff. ¶ 38 ("In my research, I have not located a single instance in which the Navy, at any time during the 1930s through the 1960s, instructed or permitted a supplier of engineering equipment to a vessel or facility to affix or provide an asbestos-related warning with its equipment.").

Although the Navy did not require warnings regarding asbestos in the Milspecs (or as Admirals Sargent and Horne suggest, did not allow such warnings), it had "state of the art knowledge regarding the potential risks associated with" asbestos, and "affirmatively addressed the issue of asbestos-related safety

precautions." Doc. No. 12-2, Horne Aff. ¶ 17. According to Admiral Horne, in lieu of warnings, the Navy "relied on training and procedures to protect its personnel against safety hazards such as asbestos," and "believed that excessive warnings for common shipboard hazards led to apathy and resulting disregard by Navy personnel." *Id.* ¶ 23; *see also id.* ¶ 20 (stating that the Navy "adopted its own precautionary measures and procedures and provided its own warnings where such warnings were deemed appropriate").

For example, in 1922, the Navy provided instructions to officers in the *Navy Medical Bulletin* regarding the proper protective measures to prevent asbestos exposure by using "water to dampen dust, exhaust systems to remove dust, [and] enclosed chambers to prevent escape of dust and respirators." Doc. No. 80-40, Forman Aff. ¶ 22; Doc. No. 80-46, Forman Ex. F. In 1939, the Annual Report of the Surgeon General of the Navy described asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods," explained there was a risk from "continued exposure to present occupational conditions" at Navy facilities, and directed methods for preventing exposure. Doc. No. 80-40, Forman Aff. ¶ 25; Doc. No. 80-48, Forman Ex. H; *see also* Doc. No. 80-40, Forman Aff. ¶ 24; Doc. No. 80-47, Forman Ex. G (Handbook of the Navy Hospital Corps including the safety measure that asbestos workers wear masks).

As another example, in 1943, the Navy, together with the Maritime Commission, issued "Minimum Requirements for Safety and Industrial Health in Contract Shipyards," which acknowledged that asbestos-related disease is a potential hazard of shipyard work and provided measures to prevent exposure.  Doc. No. 80-40, Forman Aff. ¶¶ 27-29, Doc. No. 80-44, Forman Ex. D.  Indeed, Dr. Forman documented that the Navy's acknowledgment of the hazards posed by asbestos continued through the 1960s.  *See* Doc. No. 80-40, Forman Aff. ¶¶ 30-42, and accompanying exhibits; *see also* Doc. No. 68-3, Buffalo Pumps Ex. 17 (December 9, 1968 internal Navy memorandum discussing hazards caused by asbestos and explaining that "[i]t was quite obvious from these discussions that the shipyards have for many years been aware of the hazards of asbestos and have initiated appropriate safety precautions").

    b.    *Plaintiffs' objections to Defendants' evidence*

Plaintiffs raise a number of objections to the affidavits of Admirals Horne and Sargent and Dr. Forman, and in particular Plaintiffs argue that they violate Federal Rule of Evidence 702 by offering impermissible speculation that if Defendants had tried to provide warnings regarding asbestos, the Navy would have

rejected them.[6]  At this stage of the litigation, the court rejects these objections.

Rule 702 provides that an expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  In ruling on a Rule 702 objection, the court's job is usually one of gatekeeper to prevent unreliable expert testimony from reaching the jury.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ("*Daubert I*").  As a result, Rule 702 objections are usually raised prior to trial and after the parties have had the opportunity for expert discovery.

Plaintiffs' Rule 702 objection seeks to prevent the court (as opposed to a jury) from considering this evidence in determining whether Defendants have set forth a colorable federal defense for purposes of removal.  In these preliminary stages of litigation where the court, as opposed to a jury, is the decision-maker, the

---

[6] Plaintiff further objects to Affidavits of Admirals Horne and Sargent and Dr. Forman on the basis that they lack foundation because they were not involved in enforcing the Milspecs at issue and violate the best evidence rule because they rely on contract documents that were not provided.  The court overrules the lack of foundation objection -- although none of the witnesses was involved in enforcing the specific military specifications at issue and/or determining warnings for the Navy, the witnesses are providing percipient testimony based on their experiences and service with the Navy that is helpful to the determination of the issues presented.  The court further overrules the best evidence rule objection -- the witnesses were not testifying to prove the substance of the documents discussed, but rather providing their opinions regarding what the Navy required.  *See Willis v. BW IP Int'l Inc.*, 811 F. Supp. 2d 1146, 1155 (E.D. Pa. 2011) (rejecting objection on same basis); *see also Ballenger v. Agco Corp.*, 2007 WL 1813821, at *3 (N.D. Cal. June 22, 2007) (explaining that Admiral Horne's declaration suffices to establish that the defendant worked under the direction of a federal officer and that "contracts from decades past" need not be produced).

primary purpose of Rule 702 -- "to protect juries from being swayed by dubious scientific testimony," -- is not present. *See In re Zurn Pex Plumbing Prods. Liability Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). And in their objections, Plaintiffs do not request a full *Daubert* evidentiary inquiry. Indeed, the court believes that a full *Daubert* inquiry is not proper at this stage in the litigation where the parties have not taken discovery and Defendants need only make out a "colorable" federal defense. Thus, the court's *Daubert* inquiry is necessarily limited by the evidence presented by the parties and the issue before the court. *Cf. Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999) (stating that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"); *United States v. Calderon-Segura,* 512 F.3d 1104, 1109 (9th Cir. 2008) (explaining that a court's "decisions regarding the type of proceedings required to conduct the [*Daubert*] gatekeeping inquiry in a particular case" is reviewed for abuse of discretion).

In determining the appropriate scope of analysis, the court finds useful the "focused" *Daubert* inquiry courts have applied in addressing the admissibility of expert testimony on another preliminary issue -- class certification. Specifically, given the "inherently preliminary nature of pretrial evidentiary and class certification rulings," courts have applied a tailored inquiry assessing whether the

25

opinions offered, based on their areas of expertise and reliability of their analyses of the available evidence, should be considered in deciding the issues relating to class certification. *See In re Zurn*, 644 F.3d at 613; *Bruce v. Harley-Davidson Motor Co.*, 2012 WL 769604, at *4 (C.D. Cal. Jan. 23, 2012); *see also Behrend v. Comcast Corp.*, 655 F.3d 182, 204 n.13 (3d Cir. 2011) (stating that a court "need not turn class certification into a mini-trial," and instead must "evaluate whether an expert is presenting a model which could evolve to become admissible evidence, and not requiring a district court to determine if a model is perfect at the certification stage").

Similar to class certification, the court's determination on Defendants' federal defense is inherently preliminary and may change after discovery. Thus, at this stage, the court inquires whether the opinions of Admirals Horne and Sargent and Dr. Forman, based on their areas of expertise and reliability of their analyses of the available evidence, should be considered in deciding whether Defendants have established a colorable federal defense. In other words, the court performs its *Daubert* inquiry based on the evidence presented at this time and in light of the specific issue presented of whether the Navy would have permitted asbestos warnings.

In conducting this limited *Daubert* analysis, the court recognizes that

the expert testimony must meet two requirements.  First, the proffered testimony

must be reliable, *i.e.*, the expert's testimony reflects scientific knowledge, the

findings are derived by the scientific method, and the work product amounts to

"good science."  *Daubert v. Merrell Dow Pharm*., 43 F.3d 1311, 1315 (9th Cir.

1995) ("*Daubert II*") (citation and quotation signals omitted).  Second, the

testimony must meet the "fit" requirement, *i.e.*, "it logically advances a material

aspect of the proposing party's case."  *Id.*  Because there is no dispute that

Defendants' proffered testimony that the Navy would not have permitted asbestos

warnings advances Defendants' colorable federal defense, the court focuses on the

first *Daubert* inquiry -- whether the testimony is reliable.

The first inquiry generally focuses on the expert's "principles and

methodology, not on the conclusions that they generate," *Daubert I*, 509 U.S. at

594-95, and there are a number of non-exclusive *Daubert* factors that the court

may consider.  These factors help to establish whether the proffered testimony is

supported by a sufficient foundation and not "mere subjective beliefs or

unsupported speculation."  *See Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d

971, 979 (9th Cir. 2009); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517,

529-30 (6th Cir. 2008) ("The task for the district court in deciding whether an

expert's opinion is reliable is not to determine whether it is correct, but rather to

determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

Where the expert provides non-scientific testimony as in this case, however, the "*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (citations and internal quotation marks omitted). The court therefore satisfies its gatekeeping role of determining whether non-scientific expert testimony rests upon a reliable foundation and not unsupported speculation by probing the expert's knowledge and experience. *Id*. at 1018.

The affidavits of Admirals Sargent and Horne and Dr. Forman set forth each expert's knowledge and experience supporting the opinions they provide. Specifically, each expert laid a foundation for their opinion based upon their extensive experience in the Navy, which for Admiral Horne involved ship design, engineering, construction, overhaul and inspection, and monitoring compliance with Milspecs, Doc. No. 12-2, Horne Aff. ¶¶ 2-3; for Admiral Sargent involved the operation and maintenance of Navy warships, Doc. No. 75, Sargent

Aff. ¶¶ 1-2; and for Dr. Forman involved comprehensive knowledge of the Navy's knowledge and awareness regarding the hazards of asbestos.  Doc. No. 7, Forman Aff. ¶ 15.  These experts' extensive experiences in the Navy provide the basis and foundation for their opinions regarding what the Navy would, or would not, have allowed as to asbestos warnings, and take this testimony outside the realm of unsupported speculation.  And such testimony is certainly helpful in determining whether Defendants have established a colorable federal defense, and in particular whether the government exercised its discretion in determining the warnings to provide.

And to the extent Plaintiffs assert that this testimony is contradicted by other evidence, the court's job at this stage is not to weigh the evidence, but merely to determine admissibility (especially in light of the preliminary stage of litigation).  *See Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 220 (9th Cir. 1958) ("[Plaintiff] can, through cross-examination, expose to the jury the asserted deficiencies of the hypothetical question as asked.  It is for this reason that it is usually held that defects in such a question go not to the competency of the evidence, but merely affect its weight."); *see also Daubert I*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence.").

The court therefore OVERRULES Plaintiffs' Objections to the Affidavits of Admirals Horne and Sargent and Dr. Forman. As described above, the court makes this ruling in the context of addressing whether Defendants have established a colorable federal defense at the removal stage. This ruling is without prejudice to Plaintiffs raising any Rule 702 objections later in this litigation.

### c. *Plaintiffs' evidence*

In comparison to Defendants, Plaintiffs present evidence drawing a very different picture that Defendants might have been able to provide warnings related to asbestos.

According to Plaintiffs, Milspecs did not prevent asbestos warnings. For example, Milspec 129 specified that hazardous chemicals should be marked in accordance with the Manufacturing Chemists' Association Manual L-1 ("Manual L-1"), which provides that chemicals which generate "harmful dusts" should have a caution label. *See* Doc. No. 29-7, Pls.' Ex. 5 at 16-17; *see also* Doc. Nos. 29-10, 29-11, Pls.' Exs. 8-9 (Milspecs requiring compliance with Manual L-1); *see also* Doc. Nos. 29-12 - 29-16, Pls.' Exs. 10-14 (incorporating the requirements of Milspec 129 into other specifications). In turn, Manual L-1 specifies that "warning labels suggested in the Manual should be used in addition to, or in combination

with, any label required by law." Doc. No. 29-7, Pls.' Ex. 5 at 6. Adam Martin, a

former "Action Officer" for Milspec 129, testified in a separate civil action that

Milspec 129 did not prevent manufacturers from including warnings with their

products. *See* Doc. No. 29-17, Pls.' Ex. 15 at 20, 29, 30. And in another civil

action, the United States denied in a request for admissions that Milspec 129

prevented the placement of a label concerning asbestos. Doc. No. 29-18, Pls.' Ex.

16.

     As to labeling, the Navy stated in various documents that Navy

labeling requirements did not override manufacturers' obligations under state and

federal law. For example, in SECNAV 5106.8, titled "Uniform Labeling

Program," the Navy explained that the instructions provided did not govern "[t]he

type of labels to be affixed by the manufacturer," which are instead "governed by

State and Federal laws and regulations depending on the nature of the material and

whether the shipment is interstate or intrastate." Doc. No. 29-19, Pls.' Ex. 17,

¶ 2(a). In its 1969 "Consolidated Hazardous Item List," ("CHIL") NAV SUP

Publication 4500, the Navy instructed that Milspec 755A supplements labels

required under regulations and/or by the manufacturer, and that the supplemental

labels "<u>shall not</u> cover, or cause to deface or remove any other hazardous

labels/markings affixed to the containers in accordance with the preceding

regulations." Doc. No. 29-20, Pls.' Ex. 18, ¶ 3. The CHIL further lists asbestos as a hazardous item. *Id.* at B-3. By its 1977 version, the CHIL provided that "[w]hen material is received from contractors with labels or symbols already applied, the information on the container takes precedence over the information in the CHIL." Doc. No. 29-21, Pls.' Ex. 19 at 6.

As to technical manuals, certain Milspecs, for example Milspec 15071D, provided that the Navy will "accept the manufacturer's commercial type of manual or prepared in accordance with its commercial practice whenever it is roughly equivalent to the detail requirements included herein." Doc. No. 29-24, Pls.' Ex. 22, § 1.1; *see also* Doc. No. 29-26, Pls.' Ex. 24, Milspec 38784, § 3.16.1 (providing that "appropriate precautionary requirements shall be included" when hazardous or adverse health factors cannot be eliminated). And equipment manufacturers included warnings regarding other toxic substances in their manuals. *See* Doc. Nos. 29-27 - 29-33, Pls.' Exs. 25-31 (providing various warnings for toxic and/or inflammable solvents, and showing between manuals different wording and/or lack of any warning for certain solvents).

Finally, Plaintiffs present evidence that some manufacturers placed warnings on their products as early as the 1960s. *See* Doc. No. 29-35, Pls.' Ex. 33 (internal correspondence from Johns-Manville outlining companies that placed

warning labels on their products containing asbestos).  By the 1980s, both Crane and Buffalo Pumps attached asbestos warnings with their products.  *See* Doc. No. 29-36, Pls.' Ex. 34; *see also* Doc. No. 29-39, Pls.' Ex. 37.  Crane included such warning "to fulfill the 'failure to warn' clause in many state product liability statutes," Doc. No. 29-38, Pls.' Ex. 36, and Buffalo Pumps included such warning of its own volition and even though the Navy specifications did not specify that such warning was necessary.  Doc. No. 29-39, Pls.' Ex. 37 at 150-51.

### 3. *Application of Evidence to Colorable Federal Defense*

Viewing the evidence in a light most favorable to Defendants, *Hagen*, 739 F. Supp. 2d at 782-83, the court finds that Defendants have established a colorable government contractor defense.

The first element -- that the government exercised its discretion and approved certain warnings -- is met where the government's approval [of warnings] goes "beyond merely 'rubber stamping' the contractor's choice.  If the government chooses its own warnings, the contractor has certainly fulfilled this first condition."  *Oliver*, 96 F.3d at 1004; *see also Butler*, 89 F.3d at 586 (stating that the government contractor defense may apply to a state failure-to-warn claim where the evidence shows that the defendant was "acting in compliance with 'reasonably precise specifications' imposed on it by the United States").  The

relevant inquiry is whether the Navy exercised discretion, "not dictation or prohibition of warnings." *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995); *see also Getz*, 654 F.3d at 867; *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 438 (5th Cir. 2000) ("Although the manual contained no express evaluation of a warning of the specific hazard of inadvertent seat release, the government contractor defense applies because the Navy exercised discretion in approving warnings in the flight manual.").

Defendants have established a colorable foundation for this element through the affidavits of Admirals Horne and Sargent explaining that the Navy provided detailed specifications that contractors were required to follow in their manufacture, labeling, and written manuals for products. According to Admiral Horne, "[t]he Navy's detailed specifications did not leave room for individual manufacturers to make determinations about the inclusion of a warning," and "[a]ny warning purportedly required by state law would not have found its way into a ship as a permanent label on a pump or as a warning in accompanying written materials unless it had been required specifically in specifications for the product that were issued by the Navy." Doc. No. 12-2, Horne Aff. ¶¶ 15-16. According to Admiral Sargent, "the Navy did not accept, and did not permit, asbestos-related warnings in technical manuals relating to individual pieces of

machinery or equipment, and . . . such warnings were . . . neither sought nor welcome from manufacturers of such items."  Doc. No. 75, Sargent Aff. ¶ 65.

The reason why such warnings would not be allowed, according to Admiral Sargent, was that the Navy focused the content of the manuals on "operating procedures and related equipment and personnel safety issues specifically associated with the particular equipment to which the technical manual related, rather than to generic occupational health issues."  *Id.* ¶ 68; *see also* Doc. No. 12-2, Horne Aff. ¶ 15; *see also* Doc. No. 76-7, Sargent Ex. S § 3.3.6 (Navy describing that "Notes, cautions and warnings should be used to emphasize important and critical instructions.  The use should be as sparing as is consistent with real need.").  And there is at least some evidence that the Navy did not merely "rubber stamp" Defendants' warnings and instead required specific changes to the wording of manuals, including edits to the warnings and cautions.  Doc. No. 12-2, Kraft Aff. ¶ 14; Doc. No. 12-9, Kraft Ex. C (Navy providing line-edits to manual, including that "Under 'Warning' add the following 'Never use water on electrical fires.  Use CO2.  Also add 'When servicing pump, disconnect from source of electrical power and tag.'").

As to the second element -- that Defendants provided warnings required by the government -- the affidavits and declarations of Defendant

corporate representatives establish that Defendants manufactured and supplied equipment to the Navy following the Milspecs. *See* Doc. No. 3-3, Anthony D. Pantaleoni Aff. ¶¶ 5-6; Doc. No. 12-8, Martin K. Kraft Aff. ¶¶ 5-6; Doc. No. 76-10, Richard M. Salzmann Decl. ¶ 6; Doc. No. 80-66, Rolan Doktor Aff. ¶¶ 7-9.

Finally, as to the third element -- that Defendants warned the Navy about dangers in the equipment's use that were known to Defendants but not to the Navy -- Dr. Forman testified that the Navy was aware of the health hazards caused by asbestos by the 1920s and continued to develop such knowledge over the years. Indeed, by the 1940s, the Navy outlined steps to prevent exposure to asbestos. There is no evidence that Defendants had any greater knowledge than the Navy concerning the hazards of asbestos. *See Oliver*, 96 F.3d at 1001. Because Defendants have no duty to warn of a danger of which the Navy is already aware, this third element is also met.

In opposition, Plaintiffs interpret *Boyle*, *Butler*, and *Hawaii Federal Asbestos* as limiting the federal contractor defense to situations where the government gives specific instructions regarding asbestos warnings and/or explicitly considers asbestos warnings proffered by the contractors. Although it is true that several district courts in this circuit have relied on *Boyle*, *Butler*, and

*Hawaii Federal Asbestos* to support such conclusion,[7] *Getz* -- issued after those

cases -- clarified any ambiguity in these cases and specifically rejected that the

defense is limited "to cases in which the government specifically forbids warnings

altogether or to instances where the government explicitly dictates the content of

the warnings adopted."  654 F.3d at 867.  *Getz* explains that the earlier decisions of

*Butler* and *Hawaii Federal Asbestos* are not so limited and that *Boyle* does not

impose such requirement in the failure to warn context:

> [*Butler* and *Hawaii Federal Asbestos*] only require that
> governmental approval (or disapproval) of particular
> warnings "conflict" with the contractor's "duty to warn
> under state law."  *Butler*, 89 F.3d at 586; *see also Haw.
> Fed. Asbestos*, 960 F.2d at 813 (rejecting the defense
> where the government's specifications were silent about
> warnings).  To read these cases as limiting preemption to
> those instances where the government forbids additional

_____

    [7]  *See, e.g.*, *Moore v. Asbestos Defendants (B*P)*, 2010 WL 2650487, at *4 (N.D. Cal.
July 1, 2010) ("In short, in the absence of any effort to warn about the dangers of asbestos,
Metalclad cannot rely on the hypothetical assertion that such an effort would have been futile.");
*Lindenmayer v. Allied Packing & Supply, Inc.*, 2010 WL 234906, at *6 (N.D. Cal. Jan. 14, 2010)
("The federal government cannot have exercised its discretion to preclude Foster Wheeler from
issuing asbestos warnings if the provision of asbestos warnings was never contemplated or
proposed in the first place."); *Overly v. Raybestos-Manhattan*, 1996 WL 532150, at *4 (N.D.
Cal. Sept. 9, 1996) ("Absent a showing by defendant that the federal government gave specific
instructions to Avondale not to warn employees of the existence of asbestos, Avondale is offered
no protection by government contractor immunity."); *see also Holdren v. Buffalo Pumps, Inc.*,
614 F. Supp. 2d 129, 137 (D. Mass. 2009) ("The defendants have submitted no evidence that the
Navy expressly prohibited asbestos warnings by manufacturers; no evidence that they ever
attempted to warn about asbestos on products destined for the Navy; no evidence that the Navy
ever rejected any other manufacturer's proposed asbestos warning; and no evidence that
defendants warned of asbestos on other, non-military equipment they produced during the same
period, by contrast to the equipment they supplied to the Navy.").

warning or dictates the precise contents of a warning
would be inconsistent with the Court's decision in *Boyle*.
*See Oliver*, 96 F.3d at 1004 n.8 (rejecting plaintiff's
argument that *Butler* and *Hawaii Federal Asbestos* could
be interpreted as imposing such a "rigid" rule).[8]  *Boyle*
makes clear that government discretion, rather than
dictation, is the standard.  487 U.S. at 512-13.

654 F.3d at 867.

As further explained by *Tate*, to require government consideration of

asbestos-related warnings would go well beyond what *Boyle* requires in the design

defect context:

A requirement that government review focus on a
particular hazard or warning at issue is simply not
analogous to a requirement that the government review
focus on a particular design.  In the context of design
defects, when the government has reviewed and approved
a design, we presume that it has weighed and accepted all
the risks associated with that design choice. We do not
require evidence that the government has addressed each
of those hazards individually.  Thus, if we were to accept

---

[8]  *Oliver* similarly rejected that *Hawaii Federal Asbestos* and *Butler* require the
government to prohibit asbestos warnings, explaining:

The position taken by the Ninth Circuit, however, does not appear
to be as rigid as the plaintiffs submit.  In the recent case of *Butler
v. Ingalls Shipbuilding*, 89 F.3d 582 (9th Cir. 1996), the Ninth
Circuit stated that the government contractor defense may apply to
a state failure-to-warn claim where the evidence shows that the
defendant was "acting in compliance with 'reasonably precise
specifications' imposed on it by the United States."  *Id.* at 586
(quoting *In re Federal Asbestos Cases*, 960 F.2d at 813 (quoting in
turn *Boyle*, 487 U.S. at 512)) (citing *In re New York Asbestos
Litig.*, 897 F.2d at 629-32.)

*Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1004 n.8 (7th Cir. 1996).

38

> the plaintiffs' argument [that the government must
> actually consider the warning at issue], we would be
> requiring proof in the failure to warn context of that
> which we accept as implicit in the design defect context.
> This would significantly increase the government
> contractor's evidentiary burden and would go beyond the
> requirements of the *Boyle* test.

140 F.3d at 658. Thus, the necessary "conflict" required by *Boyle* is created in the

failure-to-warn context where the government exercises discretion in determining

the warnings to provide, and does not require the government to make a decision

regarding asbestos warnings in particular. Under this standard, Defendants have

met their burden of establishing a colorable federal defense.

Plaintiffs also argue that the evidence they present conclusively

establishes that Defendants could have provided warnings regarding asbestos.

Although Plaintiffs' evidence certainly calls into question the assertions made by

Admirals Horne and Sargent and Dr. Forman, the court's job at this time is not to

weigh and/or determine whether Defendants will ultimately prevail in establishing

a federal defense. Rather, the court's inquiry is focused on whether Defendants

have established a *colorable* federal defense. *See Willingham*, 395 U.S. at 407

(stating that to justify removal, a defendant need not assert a "clearly sustainable

defense," nor does he need to "win his case before he can have it removed").

In sum, the court finds that Defendants have presented evidence that

the Navy "considered, reviewed, and determined which warnings to provide [such that] the government's exercise of discretion necessarily 'conflicts' with the Contractors' 'duty to warn under state law.'" *Getz*, 654 F.3d at 867. Defendants have therefore established a colorable federal defense.

## B.    Causal Nexus Between Defendants' Actions Taken Pursuant to a Federal Officer's Directions and Plaintiffs' Claims

To establish a causal nexus between Defendants' conduct performed pursuant to the Navy's direction and Plaintiffs' failure-to-warn claims, Defendants must "by direct averment exclude the possibility that [the defendant's action] was based on acts or conduct of his not justified by his federal duty." *Mesa*, 489 U.S. at 132 (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926)). Where a government contractor is the defendant, the causal nexus requirement "'is closely related to evidence supporting a colorable federal defense' . . . because both elements require the 'defendant [to] show that it acted at the federal government's command.'" *Hagen*, 739 F. Supp. 2d at 785 (quoting *Holdren*, 614 F. Supp. 2d at 149). Thus, "just as the acting under analysis becomes redundant where a defendant in a government contractor case makes out a colorable federal defense, resolving the causal nexus requirement is not difficult in light of the Court's colorability determination because the causal nexus analysis 'is essentially the same as [that associated with] the colorable defense requirement.'" *Id.* (quoting

40

*Prewett v. Goulds Pumps (IPG)*, 2009 WL 2959877, at \*7 (W.D. Wash. Sept. 9, 2009)).

As described above, viewed in a light most favorable to Defendants, the evidence suggests that Defendants manufactured equipment for the Navy pursuant to the close direction and supervision of the Navy, and that the Navy exercised its discretion in determining what warnings manufacturers would include. Thus, Defendants have established a causal nexus between their conduct performed pursuant to the Navy's direction and Plaintiffs' failure-to-warn claims, and have established that this action is removable pursuant to 28 U.S.C. § 1442(a)(1).

## V. CONCLUSION

Based on the above, the court finds that Defendants have demonstrated that they properly removed this action pursuant to 28 U.S.C. § 1442(a)(1). The court therefore SUSTAINS the Objections to the January 23,

///

///

///

///

///

2012 Findings and Recommendation and DENIES Plaintiffs' Motion for Remand.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 13, 2012.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Leite et al. v. Crane Co. et al.*, Civ. No. 11-00636 JMS/RLP, Order (1) Sustaining Objections to January 23, 2012 Findings and Recommendation to Grant Plaintiffs' Motion for Remand; and (2) Denying Motion for Remand